on behalf of the appellant Ritchie. Your Honors, this appeal concerns the Bankruptcy Court's grant of affirmative summary judgment to Polaroid trustee on his actual fraud claim relating to Polaroid's transfer of liens on certain trademarks to Ritchie. To prevail on an actual fraudulent transfer claim, the trustee must prove that Polaroid granted the liens on the liens to Ritchie. Whether a debtor intended to defraud a creditor is a question of fact, and the trustee bears the burden of proof on that question of fact. Ordinarily, this Court and other courts look to the fact-intensive badges-of-fraud analyses to determine the debtor's intent. Properly applied, the Ponzi presumption can bypass the usual badges-of-fraud analysis. Because the Ponzi presumption bypasses the usual badges-of-fraud analysis, it should be narrowly construed. Here, it is our contention that the lower courts misapplied the Ponzi presumption. The Ponzi presumption cannot be applied here because Polaroid was a legitimate business that was not doomed to fail. Polaroid was not operating a Ponzi scheme. No court has ever applied the Ponzi presumption to a debtor that was not operating a Ponzi scheme. The rationale for a Ponzi scheme is the fact that the debtor's scheme is inherently insolvent and is destined to fail, and that the creditors of the Ponzi scheme are certain to suffer losses. A Ponzi scheme never has enough cash to meet all of its needs, and a Ponzi scheme will inevitably crash because it cannot attract a sufficient number of new investors to keep the scheme afloat. Because a debtor that is operating a Ponzi scheme must know that the Ponzi scheme will fail and its creditors will be harmed by the failure of the Ponzi scheme, the intent to defraud can be presumed. There is no basis to presume that Petters must have known that Polaroid would eventually collapse. There is no basis to presume that Petters knew that granting the liens on certain trademarks to Ritchie would— Wait a minute. Sure. I thought the record was that Polaroid was having some financial difficulty and that not to do this. Well, first of all, Your Honor, the issue of whether Polaroid was solvent was an issue that was not before the lower courts. Moreover— Not whether it was insolvent or not, just it was in some financial difficulty. Well, it was never—right. It was not— And that the CEO had recommended not doing it. The CEO learned about it after the fact. She did not know all the details. One of the details she did not know was the fact that the liens had a $75 million carve-out to provide security for working capital. At the time, Polaroid was looking to Stillwater for a $70 million investment. The liens with that carve-out would have covered that. So there's really no concern that the liens would have impacted Polaroid in any way negatively. Polaroid was solvent. It always had cash. What value did Polaroid get out of putting its valuable trademarks up? Well, the value that Polaroid received was—there was no direct benefit to Polaroid. The benefit it received—and this was testified to by PGW employees and Polaroid employees—was the—there was about $158 million of loans here. 146 million of them were to—were notes that were signed by PGW—not the Ponzi scheme, PCI—PGW and Petters. 12 million were related to PCI. If PGW defaulted on the notes, that could have a negative impact on Polaroid. So the thought was that the giving of the Polaroid liens to extend the loans to PGW would have an impact—a viable impact on Polaroid. And also, Your Honor, the issue here is fraudulent intent. The trustee has to prove that the and there's strong evidence that Polaroid was fraudulent, and there's substantial evidence it had more than enough assets to pay off its creditors. And given it had more than enough assets to pay off its creditors, a Ponzi scheme cannot be presumed. There's no basis to think that Polaroid was going to fail and that the liens would harm Polaroid. These liens, Your Honor, Polaroid could still license these trademarks, even with the liens on them. There was a carve-out relating to the ability to get cash for Polaroid. So they had really no impact on the creditors, particularly given the evidence in the lower court that there were substantial assets at Polaroid, including about $100 million in cash and liquid assets to pay creditors. And the issue of solvency was not addressed in the lower court. But I think, Your Honor, when we talk about the Ponzi presumption, it bears discussion about what is a Ponzi scheme. And a Ponzi scheme is where there's no underlying business venture at the debtor. And it is, it, it, sure, isn't it true that when Petters exercised his total control over Polaroid and unilaterally granted the liens to Ritchie, didn't he essentially enshrine the company in his scheme and transform it from a legitimate business into an instrumentality of his Ponzi scheme? No, first of all, isn't he the entity here? Well, first of all, Your Honor, the, Tom Petters owned Polaroid, and Tom Petters owned PGW, and Tom Petters owned PCI. And the law is crystal clear in, in this state and in most states that a 100% owner of a company can take money out of a company, as long as he doesn't harm creditors for any purpose, even a non-corporate purpose. To the extent that Tom Petters took money out of Polaroid, and that transfer was not fraudulent, and you have to focus on the transfer, if that transfer was not fraudulent, it doesn't matter how he used those assets. It really does not matter for purpose of the issue before the court, which is whether the, the granting of the liens defrauded Polaroid's creditors. That's the issue. And, and, and, the cases are, are clear on that. And also, there is evidence that there was a legitimate purpose for this, and that was to save PGW. There's evidence in the record that Tom Petters thought Polaroid was the, was his ticket to, out of this Ponzi scheme. This was, he viewed this as a $4 billion company. Is this a routine type of corporate decision? Well, Your Honor, the, the, the, the, 80% interest to save your own company? Well, the, the interest rate, these are short-term loans. The 80% interest rate was an annualized basis. They're very short. Well, Sabrina would have been embarrassed to do that. Right. They were, they, no doubt the interest rates were high. But again, those, the interest rates relates to the loans that Ritchie made in February. We're talking about the transfers that occurred in August. So, and, and, and the fraudulent transfer law is focused on the transfers. There's, there's significant case law that you don't look to the underlying, the underlying transaction. You look to the purpose for the fraudulent, or the purpose of the transfers. And here, there's no evidence that the transfers are fraudulent. And, as I said, I, Tom Petters viewed Polaroid as a legitimate business that was his ticket out of the Ponzi scheme. He viewed it as a $4 billion investment. And to the extent that the, the trustee cites to Tom Petters using Polaroid to further his scheme, they talk about two transactions of cash. Not one of them happened from a sister company of Polaroid, not Polaroid. The other transfer, transfer of cash happened after the liens were granted. So, there's, there's no argument been made that the, the Polaroid was somehow tapped routinely for cash to, to support the Ponzi scheme. Well, what about there's some reference that Petters bought Polaroid with his Ponzi scheme money? Well, that's, that is also a disputed issue of fact, too. But, again, it, my thought is that that's an irrelevant fact. Because, again, if it was bought with Ponzi scheme money, you could take the company. That doesn't make the company illegitimate. The company had legitimate business. It only derived its, its, its monies from two sources, bank loans and profits. And you focus on the transfer. The, the, the focus has to be on the transfer. The fact that Polaroid was bought years and years ago, supposedly with Ponzi scheme money, even though it's a disputed issue of fact, has no relevance to the transfers or to the granting this, of these liens in October, in August of 2008. But going back to the, to what a Ponzi scheme is, you know, the Ponzi scheme is, is a, is a, when a debtor is a Ponzi scheme, it is operating by attracting new investors. It has no legitimate business. It's perpetually insolvent from the day it opens its doors. Because the extent it's paying principal and interest to investors, it can never meet its debts. And it always needs more and more cash. And, and Ponzi schemes inevitably fail because they must continue to grow to the extent that they cannot attract new investors. They fail. And that, that is how the, the, the law of Ponzi presumption has, has developed, based on those facts. If you look at the independent clearinghouse case, the court concluded because of the way a Ponzi scheme is structured, because it is inherently insolvent from the day it opens its doors, because the, the operator of a Ponzi scheme must have known that, that its investors would be harmed, that you can presume fraud. And they, and the court said knowledge to a substantial certainty constitute intent in the eyes of the law. And a debtor's knowledge that future investors will not be paid is sufficient to satisfy the actual intent to defraud them. So, and the court held that there can be no other reasonable inference, inference other than fraud in connection with a, with a Ponzi scheme. There's a second element to the Ponzi presumption, and that is the in furtherance of. But the first element, that the debtor is operating a Ponzi scheme, is the key element. That is the element from which the premise, the presumption arises. Because if you operate a Ponzi scheme, you know it's going to fail. Polaroid was not a Ponzi scheme. Polaroid had legitimate business. It had nothing to do with the diverting business that Tom Petters was involved in, which purportedly involved buying electronic equipment in Europe and then reselling it to a big box, big box. Sure. The evidence show, why did he use Polaroid in the manner in which he did? Maybe you've already explained it to us. Well, as I said, there's a couple reasons why he used Polaroid. He bought Polaroid thinking this gave him some legitimacy. He thought Polaroid was his ticket out of this Ponzi scheme. He knew he was getting deeper and deeper into the Ponzi scheme. He bought a company he thought was worth four billion dollars. It had legitimate business. It was a legitimate company. No one, the district court, the bankruptcy court, no one has ever said that Polaroid was involved in the Ponzi scheme. Polaroid was a legitimate business. What Tom Petters did here is he granted liens to Ritchie to extend loans primarily to Polaroid's parent company, PGW. But again, to the extent that Polaroid was not involved, the district court found that Polaroid was a distinct business. It had real assets, real customers. It had manufacturing and retail business, trademarks over a billion dollars. It was expected to be profitable in 2009. It would have been profitable in 2008, but for an accounting change. Its operations were strong. It survived outside of, even after the raid, it survived for several months. On the eve of bankruptcy, the CEO of Polaroid talked about having strong operations with substantial cash reserves. So there's absolutely no reason to issue here that granting the liens to Ritchie, you can presume that Mr. Petters intended to defraud Polaroid creditors. That cannot be presumed because Polaroid was not a Ponzi scheme. In particular, Polaroid was solvent. So presumption of intent to defraud Polaroid creditors cannot be made here. If there are no further questions, I'd like to reserve the balance of my time. Mr. Fleming. Good morning. Good morning, Your Honors. Terry Fleming and my partner, George Singer. We represent John Stabner, the Polaroid trustee. The trustee requests this court to affirm the district court order granting summary judgment on its actual fraud claims. The court below properly found that Tom Petters, acting for Polaroid, transferred Polaroid's assets with the actual intent to hinder, delay, or defraud Polaroid's creditors. The context of this transfer is important. The scheme. He obtained $189 million from Ritchie in beginning in February through May at jaw-dropping interest rates. All of the money that was received, there were obligations of PGW and PCI. Well, the first ones were just PGW and Tom Petters, but all the money was wired directly to PCI, and on the same day the money was received, it was used to pay off prior investors, a classic component of the Ponzi scheme. None of the money went to Polaroid, and there were no obligations of Polaroid arising from the money that Ritchie provided back in this February to May time period. Fast forward seven months, the Ponzi scheme was in shambles. The first lawsuit had started by a different investor. Ritchie was threatening to commence legal proceedings, and Tom Petters, over the objections of its CEO, who was concerned because of the inability of Polaroid to pay its debts as they became due, and the inability to get working capital, so she objected, but Tom Petters was in control, and he transferred the assets on September 19th, 2008, to secure... Mr. Colley just said the CEO, she didn't know about until after the fact. She got the final, she received an email with the final agreement, and she expressed her objections, but that's the whole point, is that she was the CEO, and she did express in deposition testimony that she objected to this transfer, but that's the whole issue, that Tom Petters was in control. He didn't listen to the CEO. He didn't go to the CEO for advice. He made the determination, and there was no legitimate purpose for the transfer other than to further the Ponzi scheme. Now, we went forward with our claim under two alternative theories. One was based on the Ponzi scheme presumption, although this court has not yet adopted the rationale. Five circuit courts have, and courts across the country. Not a single court has rejected the theory itself, because it makes so much sense. When a person is engaging in a Ponzi scheme, it is inevitable that it will fail. This question, this particular issue, question of federal law or Minnesota law? Well, it would be federal law with regard to Section 548. There's a separate claim that we pursued under Minnesota statute, Section 513, which has the identical language, and that would be state law. Well, so the decision, so what statute are we looking at to say that a Ponzi scheme presumption arises? It would be under the federal statute and the state statute? Well, the federal statute would be Section 548, which deals with... What are these other court of appeals? Are they looking at 548? The Uniform Transfer Act, that's my understanding. I mean, typically, courts will look at just a straight, because direct evidence of the transfer's intent is difficult, they'll look to circumstantial evidence. And over time, they have determined to look at certain badges of fraud, which indicate wrongdoing. Do you see the Ponzi scheme presumption as a separate indicator of fraud, or does it just fall within, I don't know, justice, or does it fall within the badges of fraud? It's just one of the ways you can defraud somebody. I believe it is just another way of articulating an indicia of fraud. It is like a badge of fraud, like the bankruptcy court Judge Kishel said, it's the big badge of fraud. It's the big badge of fraud because every time there's a Ponzi scheme, there's criminal act, there is no legitimate reason for the transfer, and the transfer itself is made without the provision of material information. So it's a confluence of a number of indicia of fraud. But it's another fact-finding tool, like a badge of fraud, which creates a rebuttable presumption. Now, of course, in this case, both courts below applied the presumption not in the context of a company that was engaged in the scheme itself, but rather the individual who was otherwise running the Ponzi scheme was also running a number of other entities. And both courts found that when that individual who was running the Ponzi scheme engages in a transfer of another entity in furtherance of the Ponzi scheme, that it's appropriate to use the Ponzi scheme presumption. And what's significant here is the context in which that determination was made, because as Judge Nelson found, Polaroid was inextricably intertwined with the Ponzi scheme. Ponzi scheme funds, $400 million, were used to buy Polaroid. There's been a suggestion that there's a disputed fact about it, but I'd like to see that, since the people who were involved in the transaction, Mr. Wimhoff and Ms. Coleman, testify that Polaroid was purchased with Ponzi scheme proceeds. And the forensic analyst provided, looked at it separately and provided the forensic analysis for it. There's no disputed fact about that, and that's why both courts below found that. But once it was purchased, it was used both to lure other Ponzi scheme investors with the promise of these assets, and it was also used to lull Ponzi scheme investors by providing either the promise of being given some part of Polaroid, the stock or trademarks, or otherwise. And in two different instances, Tom Petters also used Polaroid to, he ordered that monies be transferred from Polaroid to pay off Ponzi scheme investors. Now, the claim for the first time made and the last reply, never made before, before the bankruptcy court, never argued before the district court, was that that first payment was made not by Polaroid, but by Polaroid Brands, a different company. But Appellee's Appendix 25 is the wire itself, and it shows that it was Polaroid, a Polaroid wire, paying that five million dollars. And more significantly, Mr. Wimhoff, the person who directed the transfer, testified that it was Polaroid money. So that, again, it's an undisputed fact. And there was a second time, later in September, when again, Tom Petters needed some money, he's running all these various entities, he's running a Ponzi scheme, he directs Polaroid to pay another two million dollars. And it's because Polaroid was used in this fashion, and then, of course, the transfer in question, when the scheme is collapsing and he transfers it days before the government raid on Petters, the question is, well, was it inevitable that Polaroid, at that point, would get sucked into this inevitable collapse of PCI? Well, there was 3.5 billion dollars of debt that PCI had, and no assets. And it had used Polaroid, used Polaroid assets to appease various investors. It is not only obvious that if PCI went down, that Polaroid would soon follow, but that's exactly what happened. And as Mary Jeffries, the Polaroid CEO, testified, she said, well, there was some chance to get some working capital, but once Polaroid gets dragged into the bankruptcy, and people think that there's some connection between PCI and Polaroid, there's no possibility of us succeeding, compare that, as Judge Nelson did, with another Petters entity, namely Fingerhut, a company that was not inextricably intertwined with the Ponzi scheme fraud in any manner. And it did not get sucked up into any separate claims being made against that company. That's the whole issue. Because Petters used Polaroid in all of these different ways, because it was in fact inextricably intertwined with the Ponzi scheme itself, it was inevitable that it would fail. And that's exactly what happened. And furthermore, there's a second reason why the Ponzi scheme is appropriate also. Once Ritchie provided that money, 189 million dollars over a short period of time, there was no way that money could get back, could get paid back, except by Tom Petters going out and defrauding another investor to pay in money to pay off Ritchie, or exactly what happened here. Petters used a related entity that had no obligation to this investor and took its assets to the detriment of that other creditors, to that other company's creditors. It was inevitable, and that's exactly what happened. There was a suggestion that Ponzi schemes have never been, courts have never applied in the context of legitimate businesses, but a number, Ponzi schemes are so varied in the way they are set up, and criminal minds are so clever, so they set things up in a lot of different ways. But there has been, the Ponzi scheme presumption has been found, both in the context of a company which is running a Ponzi scheme, but has some legitimate businesses. Almost always there has to be some legitimate front to the business in order for the Ponzi scheme to be successful. And there is another case, which it's not identical on the facts, but to say that no other case has found that a transaction by an entity not involved in a Ponzi scheme should be subject to the Ponzi scheme presumption, that's not accurate. And Judge Nelson referred to the case, the DBS case, the District of Delaware, where DBSI was running a Ponzi scheme, there was a separate entity that was being operated to sell real estate, and the bankruptcy trustee moved to void certain of the transactions between this otherwise legitimate entity and its brokers. And the court found that it was appropriate to use it in that context. So there has been other cases, and of course the opposite is also true. You can't point to another case where under similar facts the court has applied the case. Now we relied on two different theories to prove actual fraud. The more traditional theory is the badges of fraud theory, which is well accepted by the 8th Circuit and has been for some time. And of course Congress did not by statute itemize what those badges of fraud ought be, but rather the courts were to, they relied on the courts developing common law, and there have been a lot of well-recognized badges of fraud, but that's not an exhaustive list. And in this case there are a number of badges of fraud which were appropriate for the court to find, namely the transfer of substantially all of Polaroid's assets, perhaps most significantly the lack of value, because Polaroid has given the last of its valuable trademarks to the third party, although its parent, but it got no value. This question about value, this was directly addressed by the Bankruptcy Court in its decision in footnote 30, that because there's a summary Polaroid, and there was no value, they're simply saying, well if you help out the parent you can somehow be assisted in the long run. But as Judge Kishel said, in the context here that was laughable, because the Ponzi scheme was in shambles. It was clearly at the end of its days so to suggest that there was any possible benefit to Polaroid from giving its last valuable asset and taking on all this debt, I think Judge Kishel's characterization of that argument as laughable is appropriate. Unless this Court has any other questions. Thank you, Mr. Fleming. Thank you. Colley, you have two and a half minutes. Thank you, Your Honor. Your Honor, Mr. Fleming referred to the DBSI case as a case that applied the Ponzi presumption to a debtor that is not a Ponzi scheme. That is not the case. That case involved two companies that were the halves, two halves to a Ponzi scheme. One company received the profits and had a clean balance sheet. The other company had the liabilities. In the bankruptcy proceeding, those two halves were subsequently consolidated. Very, very different situation than here. Polaroid was not involved in the Ponzi scheme. It was a legitimate business. It did not receive any Ponzi scheme monies. It made all its monies through bank loans, obtained all its monies from bank loans and through profits. The other thing I just want to emphasize is the law is crystal clear that even though Tom Petters owned Polaroid as well as owning the Ponzi scheme, and there is nothing wrong with somebody who owns 100 percent of a company taking assets from the company and using them for a non-corporate purpose so long as he doesn't hurt the creditors of the company. And there is no evidence that the creditors of the company Polaroid were hurt here. Polaroid had sufficient assets to pay all of its creditors. The objection from the CEO to the liens was after the fact. The CEO did not know about the $75 million carve-out that would allow on top of the liens, senior to those liens, the additional lending. There was at the time of the liens, there were negotiations with Stillwater to put in $70 million into Polaroid, which handled all of its cash needs, and the CEO said that. So there was no problem at Polaroid for getting cash. Richey could have been paid with other assets. There was talk about an Iconics deal for the sale of the North American Band for $330 million at the time of the liens. There was talk about a Spice Group sale, the Indian trademark, for $200 million. There was no indication that Polaroid would inevitably fail. If the Stillwater loan had gone through, Polaroid would still be with us today. It did survive for months after the bankruptcy. There was nothing inevitable about the failure, and the assets pledged here were not the only remaining value in Polaroid, as Mr. Fleming said. It still had $300 million in trademarks that were not encumbered, and it had $100 million in other assets. Thank you, Your Honor.